```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TENNESSEE
                         WESTERN DIVISION
_____

UNITED STATES OF AMERICA,         )
                                  )
    Plaintiff,                    )
                                  )
v.                                )   No. 20-cr-20162-JTF
                                  )
CHRISTOPHER ROBERT HARPER,        )
                                  )
    Defendant.                    )
_____

                     REPORT AND RECOMMENDATION
_____
```

Before the court by order of reference is defendant Christopher Robert Harper's motion to suppress. (ECF No. 41.) For the reasons below, the undersigned recommends that the motion be denied.

### I. PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the suppression hearing, as well as the parties' pre-hearing and post-hearing briefs. At the hearing, the court heard testimony from FBI Special Agent Stephen Lies, defendant Christopher Harper, and defendant's wife, Cristy Butler. Based on the undersigned's observation of the witnesses at the hearing, as well as review of the hearing transcript, the undersigned finds the testimony of Agent Lies and Butler to be credible, and finds the testimony of Harper to be not credible.

In or about January, 2020, Agent Lies was running an investigation using BitTorrent file-sharing program in an undercover capacity from an internet-connected computer located in Memphis, Tennessee. (ECF No. 41-1 at PageID 117, Lies Aff. ¶ 6; Tr. at 50.) Agent Lies was using a law enforcement version of the BitTorrent program, called "Torrential Downpour," customized to ensure downloads from a single-source only, to search the network for individuals sharing child pornography. (ECF No. 41-1 at PageID 117, Lies Aff. ¶ 6; Tr. at 62.) The program identified a device at Internet Protocol ("IP") address 73.2.174.228 that was offering torrent files. (ECF No. 41-1 at PageID 117, Lies Aff. ¶ 7.) The titles of some of the files being offered were indicative of child pornography. (Id.) Agent Lies established a direct connection with the suspect device at IP address 73.2.174.228 and initiated a download of all the files being offered. (ECF No. 41-1 at PageID 117-18, Lies Aff. ¶ 7.) A successful download was completed on January 26, 2020. (Id.) Agent Lies reviewed one of the video files that had a title indicative of child pornography; the file depicted a prepubescent female appearing to be under 12 years of age engaged in various sex acts. (Id.)

On January 29, 2020, Agent Lies identified the IP address of the computer he had connected with as being registered to Comcast for assignment to its customers. (ECF No. 41-1 at PageID 118, Lies Aff. ¶ 8.) Further review of Comcast records showed that the IP

address was registered to a residence located on Winchester Square Street in Memphis, Tennessee. (ECF No. 41-1 at PageID 118, Lies Aff. ¶ 9.) On June 6, 2020, Agent Lies interviewed the residents of that address. (Id.) One of the residents informed Agent Lies that at the time of the BitTorrent file download his brother, Christopher Harper, was living at the address and had access to their internet. (Id.) The resident provided Harper's date of birth and cell phone number to the investigators. (Id.)

Agent Lies located Harper's current address using information from the National Crime Information Center and Tennessee Department of Safety. (ECF No. 41-1 at PageID 118, Lies Aff. ¶ 10.) On June 9, 2020, Agent Lies and his partner Agent John Chevalier interviewed Harper's wife, Cristy Butler, who resided at the address associated with Harper with their children (all of whom were under the age of 12). (Id.) She informed Agent Lies that Harper only lived at the residence occasionally. (Id.) She confirmed Harper owned a tablet and laptop. (Id.) On that same date, Agents Lies and Chevalier went to a nearby car wash to talk to Harper about the child pornography investigation. (Id., Tr. at 65.) During this interview, Harper stated that he lived at the Winchester Square residence around January 2020, and that he owned a tablet and laptop computer. (Id.) He stated that the tablet had been pawned and the laptop was at a friend's house. The agents asked for his permission to search the laptop. (Id.) Harper agreed

and said that he would retrieve the laptop and call the agents when he had it. (Id.)

Harper picked up the laptop and attempted to call Agent Lies, but the agent missed the call. (Tr. at 65.) About a week later, on June 16, 2020, Agents Lies and Chevalier went to Harper's residence and interviewed him outside on the front lawn. (Tr. at 66.) During that interview, Harper revealed he had pawned his laptop at Advantage Pawn Shop. (ECF No. 41-1 at PageID 119, Lies Aff. ¶ 11.) Harper informed the agents that prior to pawning the laptop, he had wiped the computer and installed a new operating system on it because he had "gotten a blue screen of death." (Tr. at 66.) Agent Lies asked Harper if the agents could search the laptop and Harper again agreed. (Tr. at 67.) Agent Lies presented Harper with a consent to search form, which allowed investigators to retrieve the laptop from the pawn shop to search it. (Tr. at 67.) Agent Lies told Harper that "this is . . . completely consensual and he has no obligation and that he doesn't have to sign it." (Tr. at 67.) Harper signed the consent form, and both Agent Lies and Agent Chevalier signed as witnesses. (ECF No. 41-1 at PageID 119, Lies Aff. ¶ 11; Tr. at 67.) When Butler was asked at the hearing why she thought Harper signed the consent form, she stated, "[a]t that point in time he said he had nothing to hide." (Tr. at 128.) When asked what the agents said to Harper before he signed the consent form, Butler testified, "I wasn't just right there when they was

-4-

talking to him about that. I just remember one of them giving him the paper and ask would he sign to get the computer from the pawnshop or wherever it was, and Chris [Harper] – I know he had looked at me, looked at me and shook his head and he signed the paper." (Tr. at 131.)

At the hearing, Agent Lies testified that neither he nor Agent Chevalier threatened Harper with taking Harper's children from him if he did not consent to the search of his laptop. (Tr. at 68-69.) Agent Lies further testified that no such threat was made to Butler. (Id.) Harper, on the other hand, testified that those threats were made to him when he was initially interviewed by the agents at the car wash on June 9, as well as when they interviewed him on his front lawn on June 16. (Tr. at 108, 111, 113.) The undersigned finds Agent Lies testimony to be credible and Harper's testimony to be not credible, and therefore finds that no such threats were made to either Harper or Butler. At most, on one occasion, one of the agents spoke to Butler on the phone and told her that if she continued talking to her husband about the investigation, her children would be taken away. (Tr. at 129-30.) When asked if the agents said anything about taking their children if Harper did not turn over the laptop, she answered, "No . . . not if he didn't turn over the laptop. They did threaten to take my children . . . [i]f I kept communicating with Chris [Harper]." (Tr. at 126-127.)

talking to him about that. I just remember one of them giving him the paper and ask would he sign to get the computer from the pawnshop or wherever it was, and Chris [Harper] – I know he had looked at me, looked at me and shook his head and he signed the paper." (Tr. at 131.)

At the hearing, Agent Lies testified that neither he nor Agent Chevalier threatened Harper with taking Harper's children from him if he did not consent to the search of his laptop. (Tr. at 68-69.) Agent Lies further testified that no such threat was made to Butler. (Id.) Harper, on the other hand, testified that those threats were made to him when he was initially interviewed by the agents at the car wash on June 9, as well as when they interviewed him on his front lawn on June 16. (Tr. at 108, 111, 113.) The undersigned finds Agent Lies testimony to be credible and Harper's testimony to be not credible, and therefore finds that no such threats were made to either Harper or Butler. At most, on one occasion, one of the agents spoke to Butler on the phone and told her that if she continued talking to her husband about the investigation, her children would be taken away. (Tr. at 129-30.) When asked if the agents said anything about taking their children if Harper did not turn over the laptop, she answered, "No . . . not if he didn't turn over the laptop. They did threaten to take my children . . . [i]f I kept communicating with Chris [Harper]." (Tr. at 126-127.)

Agent Lies retrieved the laptop from the pawn shop that same day. (ECF No. 41-1 at PageID 119, Lies Aff. ¶ 12.) The paperwork from the pawn shop confirmed that the laptop had been pawned by Harper. (Id.) On June 22, 2020, Agent Lies reviewed the forensic image of the laptop, which included deleted files. (Id.) Although the operating system had been reinstalled on June 13, 2020, Agent Lies was able to retrieve references in the locally accessed files and browser history to files with titles that indicated they depicted child pornography, as well as thumbnails of child pornography images. (Id.; Tr. at 72.) One of the titles matched the file that was downloaded by Agent Lies on January 26, 2020. (Id.) The review also revealed searches for Torrent software and for files using the term "pthc," which is a known reference to "pre-teen hard core," and is commonly used to search for images of child pornography. (ECF No. 41-1 at PageID 119-20, Lies Aff. ¶ 12.) Agent Lies also recovered Harper's resume, which listed his experience as a computer repair technician. (Id.) Harper was subsequently indicted for possession and distribution of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B). (ECF No. 22.)

## II.  PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S.

Const. amend. IV. "[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 438 U.S. 128, 143 (1978). "A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate. United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000).

Harper asserts that he had a legitimate expectation of privacy in the files he made available for sharing using BitTorrent. Harper's argument fails because his expectation of privacy is not "one that society is prepared to recognize as reasonable." United States v. Conner, 521 F. App'x 493, 497 (6th Cir. 2013). Peer-to-peer file sharing networks like BitTorrent are expressly designed to make files on a computer available for download by the public, including law enforcement. Conner, 521 F. App'x at 497. BitTorrent users are not mere intermediaries, but rather the intended recipients of these files. See United States v. Owens, 18 F.4th 928, 931-32 (7th Cir. 2021) (describing how files are shared through BitTorrent peer-to-peer network). Public exposure of information in this manner defeats any reasonable expectation of privacy under the Fourth Amendment. Katz v. United States, 389

U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Indeed, courts across the country have uniformly rejected the privacy arguments raised by Harper involving peer-to-peer file sharing networks. See, e.g., United States v. Stults, 575 F.3d 834, 842-43 (8th Cir. 2009) (holding that defendant "had no expectation of privacy in files that the FBI retrieved from his personal computer where [defendant] admittedly installed and used LimeWire to make his files accessible to others for file sharing"); United States v. Hoeffener, No. 4:16-CR-374, 2018 WL 2996317, at *10-11 (E.D. Mo. May 9, 2018) (rejecting defendant's argument that based on Kyllo, Jones, and Carpenter line of cases he had a reasonable expectation of privacy when sharing files through BitTorrent; citing numerous cases that have rejected the position that a defendant has an expectation of privacy when using file sharing software); United States v. Maurek, 131 F. Supp. 3d 1258, 1263 (W.D. Okla. 2015) (holding defendant had no reasonable expectation of privacy in files downloaded from his computer that were shared over BitTorrent network); United States v. Hall, No. 2:15-CR-7-FTM-29CM, 2015 WL 5897532, at *6 (M.D. Fla. July 10, 2015), adopted in part by United States v. Hall, No. 2:15-CR-7-FTM-29cm, 2015 WL 5897519 (M.D. Fla. Oct. 7, 2015) (holding that "defendant can have no objectively reasonable expectation of

privacy, even if he were to have a subjective one, in files and content that he intentionally made available for everyone using peer-to-peer networks – including law enforcement – to access and download"). The undersigned agrees with the reasoning of the cases cited above, and therefore recommends that the motion to suppress the files downloaded by Agent Lies on January 26, 2020, using Torrential Downpour be denied.

Harper also challenges the agents' search of his laptop that was retrieved from the pawnshop. It is well settled "that a person may waive his Fourth Amendment rights by consenting to a search." United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004). "The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009) (quoting United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999)) (internal citation omitted). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of the circumstances.'" Carter, 378 F.3d at 587.

The undersigned finds that Harper knowingly and voluntarily consented to the search of his laptop. The government, through Agent Lies's credible testimony, has provided clear and positive

evidence that the agents obtained Harper's voluntary consent when they interviewed Harper at the car wash. At that time, Harper verbally consented to the search but was unable to provide the agents with the laptop because it was at his friend's house. A few days later, the agents met with Harper on the front lawn of his home, at which time he again verbally consented to the search of his laptop and signed a consent form. As discussed above, no threats were made to Harper by the agents, including any alleged threats about taking away his children if he did not consent. Although an agent previously told Butler over the phone that her children could be taken away if she talked to Harper about the ongoing investigation, this "threat" was made to Butler, not Harper, and thus had no bearing on whether Harper's consent was the product of coercive conduct by the agents. The undersigned recommends that the motion to suppress the search and seizure of the laptop be denied.[1]

### III. RECOMMENDATION

For the reasons above, it is recommended that Harper's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham

---

[1] It would also appear that Harper abandoned any legitimate expectation of privacy in the laptop when he pawned it. However, because this argument was not expressly raised by the government in its response brief or at the suppression hearing, the undersigned need not address it here.

-11-

TU M. PHAM
Chief United States Magistrate Judge

March 16, 2022
Date

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**